UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

          Plaintiff,

          v.                              08-CR-15A(Sr)

YINGJI JIN,

          Defendant.

_____

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant is charged in an indictment with having violated Title 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(A)(v)(II). (Docket #15). She has filed a motion seeking to suppress statements allegedly made by her to a special agent of the Immigration and Customs Enforcement ("ICE") unit of the United States Department of Homeland Security. The defendant has also filed a motion seeking to suppress certain physical evidence seized from 1325 Millersport Highway pursuant to a search warrant. (Docket #19).

The government filed a response in opposition to the defendant's motions to suppress. (Docket #21).

This Court ordered an evidentiary hearing on the defendant's motions, which hearing was held on June 20, 2008. A transcript of this proceeding was filed on July 24, 2008. (Docket #27). Thereafter, post-hearing memoranda of law were filed by the defendant (Docket #30) and the government (Docket #32).

Each motion to suppress will be addressed separately herein.

## **FACTS**[1]

Special Agent ("S.A.") Jack Waugaman, III of ICE testified that he participated in an investigation of certain massage parlors and acupressure spas in the Buffalo, New York area commencing in 2006. (T. 8). One of the establishments being investigated was known as Hong Kong Acupressure located at 1325 Millersport Highway in Amherst, New York. (T. 8). It was believed that these premises were being utilized for the purposes of prostitution based on information received from a confidential informant. (T. 10). The premises were believed to be owned by an

---

[1] The facts stated herein are taken from the transcript of the evidentiary hearing conducted by this Court on June 20, 2008 and from the exhibits submitted at the hearing as well as what has been presented by the parties in the motion papers and post-hearing memoranda. References to testimony received at the evidentiary hearing of June 20, 2008 will be designated as "T" followed by the appropriate page(s) number of the transcript of testimony.

individual named Tat Ming Chiu, who subsequently was indicted. (T. 9, 65). Arrangements had been made to utilize the services of the Amherst Police Department in carrying out this investigation by having the Amherst Police "conduct surveillance at their convenience" of the premises located 1325 Millersport Highway. (T. 9, 42-43).

During the course of such surveillance on March 21, 2007, the Amherst Police "observed a vehicle" at the 1325 Millersport Highway location which they believed "to be linked to the business" at that location. (T. 10). An "automated record check for that vehicle showed that the vehicle had expired insurance." (T. 10-11, 43). As a result, the Amherst Police requested permission from the ICE agents to "conduct a vehicle stop if the vehicle departed the area, for vehicle and traffic law violations." (T. 11, 46-47). Permission having been given, the vehicle in question was stopped by the Amherst Police after it was observed leaving the Hong King Acupressure location on March 21, 2007 for an alleged vehicle and traffic violation, to wit, driving an uninsured motor vehicle. (T. 14).

After stopping the vehicle, the Amherst Police determined that an Asian female passenger in that vehicle apparently did not speak English and did not have any identification. As a result, the United States Border Patrol was contacted and this Asian female was taken to the United States Border Patrol Office. (T. 14, 49-50).

Because he was concerned that this Asian female might be a victim of human trafficking, S.A. Waugaman proceeded to the Border Patrol Office. (T. 15). An

initial, separate interview of the defendant was conducted by Border Patrol officers "in furtherance of administrative processing. (T. 52, 54-55). Upon his arrival at the Border Patrol Office, S.A. Waugaman was advised by Border Patrol officers that the female Asian "was a Chinese national who spoke Korean and that she was illegally in the United States. She had previously been in New Jersey and then travelled to Buffalo for the purpose of working at Hong Kong Acupressure approximately ten (10) days before she was encountered by the Amherst Police." Her employment at Hong King Acupressure involved "giving massages within Hong Kong Acupressure." (T. 22-23, 54). She was now being detained "for being illegally present in the United States" and she "was not authorized employment within the United States." (T. 23, 55).

  Based on the information received from the Border Patrol Agents and his experience and other invesgiations, S.A. Waugaman considered this Asian female as one who "fit within the parameters of someone who would have been trafficked." (T. 23-24). She was now being held in "administrative detention" by reason of her illegal alien status. (T. 24, 55).

  With the assistance of a telephonic interpreter, S.A. Waugaman identified himself to this Asian female who had identified herself as Miss Kim and showed her his official credentials. (T. 25-26). He informed her that he wished "to ask her some questions about her employment" since he "understood she worked at a massage parlor." When he began his questioning of the defendant, he did not suspect her to be a target of their human trafficking investigation or a violator. Rather, he considered her

"a prospective witness." (T. 39, 55). She agreed to being questioned. (T. 26-27). No *Miranda* warnings or advice of rights were given to the defendant. (T. 40).

S.A. Waugaman was familiar with the individual he believed to be the owner of Hong King Acupressure by reason of the fact that they had been investigating him and had obtained a search warrant on March 20, 2007 for the Hong Kong Acupressure premises at 1325 Millersport Highway, Amherst, New York. He asked defendant "about her employer, what her association or role to the business was, what financial obligations she was under as an employee." (T. 27). In asking questions of her about her employer, he "used [his] knowledge of him and his characteristics of his description (sic) as a baseline of answers [he] was expecting as she provided answers." (T. 28). When he questioned her about "female managers," her voice rose and "she spoke more rapidly" and "did not have much information about the owner" of Hong Kong Acupressure. (T. 29). Toward the end of his questioning, she stated "words to the effect, 'If I'm illegal, I'm illegal, I'll just go back. Why all these questions? Why are you asking me all these questions?'" (T. 30, 61).

He responded by telling her that "her answers didn't seem truthful, didn't seem she was being honest about who the owner was, or if there was a manger employed." He further commented that he "didn't know if she was just an employee or the manager herself." Thereupon, "she physically dropped her shoulders and looked to the ground" and stated "that she was the manager." (T. 30, 62-63). S.A. Waugaman asked the defendant a few more questions "because of her appearing to become more

frustrated that [he] was asking specific questions about who her bosses were" and in order to "gauge if she was just trying to make [him], . . . , to tell [him] what [he] wanted to hear at the time." He asked her "if she was the manager" and "how does she not know who the owner is?" The defendant replied that "she operated Hong Kong Acupressure with her boyfriend, who she previously had called him (sic) her boyfriend, and that was Sang Ki Chun." (T. 31, 41). S.A. Waugaman once again asked the defendant "if she was the manager, how much money per massage does she collect from the employees, and how much of the massage fee does the employee retain?" She stated that of the $60 massage fee, she collects $50 and the employees keep $10. (T. 32-33). It was at this point that S.A. Waugaman "believed that [the defendant] was probably telling the truth as far as her role with the business and [he] stopped questioning her" since he now believed that the defendant "was not a victim of human trafficking, but someone operating a business in this investigation" and he did not want "to tip [the government's] hand "by "Mirandiz[ing] her and continu[ing] questioning, because of the impending enforcement action" and in order not to lose "any evidence that may be recovered during the search warrants (sic)." (T. 33, 40-41). This line of questioning "through the interpreter did not last more than two minutes." (T. 34). Once he concluded that the defendant "was going to be a target of the investigation, [he] stopped questioning her." (T. 34). Thereupon, he left the Border Patrol Office while the defendant remained in "administrative custody" of the Border Patrol officers. (T. 34).

      A search warrant application based on the affidavit of S.A. Waugaman was submitted to Magistrate Judge Scott seeking, among other things, a search warrant

authorizing the search of the premises located at 1325 Millersport Highway, Amherst, New York on March 20, 2007, and a search warrant for same was issued by Judge Scott on that date. However, the actual search of the premises at 1325 Millersport Highway, Amherst, New York did not take place until March 26, 2007.

None of the information obtained from the defendant in the aforesaid interview by S.A. Waugaman was used in the affidavit used in support of the search warrant for the premises at 1325 Millersport Highway in Amherst, New York. (T. 35).

The defendant did not reside at 1325 Millersport Highway, Amherst, New York on March 26, 2007, the day the search warrant was executed. She resided with her boyfriend "in an apartment complex down the road from Hong Kong Acupressure." (T. 69).

## **DISCUSSION AND ANALYSIS**

The defendant asserts that the stop of the vehicle in which the defendant was a passenger on March 21, 2007 by the Amherst Police was illegal since it "was nothing more than a pretext which allowed surveillance units to keep watch as uniformed police officers searched this vehicle without resorting to warrants or establishing probable cause." (Docket #30, p. 6).

This position of the defendant is without legal support or merit.

As the Court of Appeals stated in *Scopo*:

> When an officer observes a traffic offense - however minor - he has probable cause to stop the driver of the vehicle. (Internal quotation marks and citations omitted). The fact that the police [choose] to wait until [the defendant] stopped . . . to arrest him, or that traffic arrests were not necessarily part of their usual duties . . . does not negate the fact that they directly observed [the defendant] violating the traffic laws and thus had probable cause to arrest him.

United States v. Scopo, 19 F3d. 777,782 (2d. Cir. 1994).

The United States Supreme Court has also ruled that:

> An automobile stop is thus subject to the constitutional imperative that it not be '**unreasonable**' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.

*Whren v. United States*, 517 U.S. 806 (1996) (emphasis added).

It is also pointed out that a claim by the defendant that the officers were engaged in a "pretextual arrest*," i.e.*, arrest for traffic violations, is of no legal consequence. The United States Supreme Court has ruled that in analyzing Fourth Amendment issues such as presented herein, "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not . . . the officer's actual state of mind at the time the challenged action was taken" is the determinative factor to be considered. *Maryland v. Macon*, 472 U.S. 463, 470-71 (1978).

Prior to the movement of the vehicle in question, the Amherst Police determined through an "automated record check for that vehicle" that the insurance on the vehicle had expired. (T. 10-11, 43). Section 319(1) of the New York Vehicle and Traffic Law expressly provides:

> Any owner of a motor vehicle registered in this state, or an unregistered motor vehicle, who shall operate such motor vehicle or permit it to be operated in this state without having in full force and effect the financial security required by the provisions of this chapter and any other person who shall operate in this state any motor vehicle registered in this state, or an unregistered motor vehicle, with the knowledge that the owner thereof does not have in full force and effect such proof of financial security, except a person who, at the time of operation of such motor vehicle, had in effect an operator's policy of liability insurance, as defined in section three hundred eighteen, with respect to his operation of such vehicle shall be guilty of a traffic infraction and upon conviction may be fined not less than one hundred fifty dollars or more than one thousand five hundred dollars or may be imprisoned for not more than fifteen days or both. In addition to the penalties herein set forth, such person, upon conviction, shall also become liable for payments to the department of the civil penalty provided in subdivision five of this section.

As a result of the "automated record check" of the vehicle in which the defendant was a passenger, the Amherst Police had probable cause for stopping such vehicle and make the inquiries that were made.

Section 140.10 of the New York Criminal Procedure Law ("CPL") authorizes a police officer to arrest a person without a warrant for any offense when the officer has reasonable cause to believe that such person has committed such offense

in his presence. Section 155 of the New York Vehicle and Traffic Law provides that for purposes of arrest without a warrant, a traffic infraction shall be deemed an offense.

Since the stop of the vehicle by the Amherst Police was a routine traffic stop on a public highway, there was no requirement on the part of the officers that they administer a *Miranda* warning and advice of rights to the occupants of the vehicle prior to questioning them. *Berkemer v. McCarthy*, 468 U.S. 420, 441 (1984).

Therefore, defendant's claim that the traffic stop on March 21, 2007 was illegal causing everything that transpired as a result of this stop to be "fruit of a poisonous tree" requiring suppression of the evidence is without merit.

The defendant asserts that since S.A. Waugaman failed to giver her a *Miranda* warning and advise her of her constitutional rights, the statements made by her in response to his interrogation must be suppressed. (Docket #30).

The government claims that because the defendant was not under arrest at the time of the interview conducted by S.A. Waugaman, and only in "civil detention" for immigration purposes, there was no requirement to give a *Miranda* warning and advice of rights to the defendant until it became apparent to S.A. Waugaman that he considered the defendant as a possible suspect in the ICE criminal investigation. (Docket #32).

The reasoning of the government is defective and without sound legal basis.

In *Miranda*, the United States Supreme Court created a procedural mechanism with the purpose of establishing a prophylactic safeguard that would protect a defendant from the coercive nature of custodial interrogation and preserve her Fifth Amendment privilege against self-incrimination. However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any significant way." *Miranda v.* Arizona, 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S. 292, 296-297 (1990); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004). The defendant bears the burden of proving custody. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984). In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances. *California v. Beheler*, 463 U.S. 1131, 1125 (1983)*; Tankleff v. Senkowski, supra*. "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (Citation omitted). *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The United States Supreme Court has "explicitly recognized that Miranda warnings are not

required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'." *California v. Beheler* at 1125; *Mathiason* at 495.

As the Court of Appeals for the Second Circuit has stated, the Supreme Court's decision in *Berkemer* "emphasizes that 'the only relevant inquiry [in determining when a person is in "custody" for purposes of Miranda] is how a reasonable man in the suspect's position would have understood his situation'." *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001).

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave. *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted, *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski* at 243-244.

In considering the totality of the circumstances as they relate to the defendant herein, the only reasonable conclusion one can draw is that the defendant

was in "custody," albeit "administrative detention" (T. 24, 55) when she was subjected to interrogation by S.A. Waugaman. The defendant was a passenger in an automobile stopped by uniform Amherst Police; she was removed from the vehicle and transported by uniform Border Patrol officers to the United States Border Patrol office where she was interrogated by uniform Border Patrol officers who determined that she was illegally in the country and was now being detained as an illegal alien (T. 14, 22-23, 49-50); she was then subject to interrogation by S.A. Waugaman who identified himself as a special agent of ICE (T. 25-26) which interrogation also took place in the Border Patrol office. No *Miranda* warning was given by S.A. Waugaman prior to commencing his interrogation; nor was any advice of rights given. (T. 40). It was during this interrogation process that the defendant allegedly admitted that she was an illegal alien and described her role and operations at the Hong Kong Acupressure establishment. (T. 30, 31, 32-33, 41, 61, 62-63).

The fact that S.A. Waugaman commenced his interrogation of the defendant based on his belief that she may be a "victim of human trafficking" (T. 23-24) or a "prospective witness" (T. 39, 55) did not eliminate the requirement that a *Miranda* warning and advice of rights be given to the defendant before interrogating her. As the Supreme Court of the United States has stated:

> We hold, not for the first time, that an officer's subjective
> and undisclosed view concerning whether the person being
> interrogated is a suspect is irrelevant to the assessment
> whether the person is in custody.

\* \* \*

> Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.
>
> \* \* \*
>
> It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*. See F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 232, 236, 297-298 (3d ed 1986). The same principle obtains if an officer's undisclosed assessment is that the person being questioned is not a suspect. In either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts. Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry.

*Stansbury v. California*, 511 U.S. 318, 319, 323, 324.

It is the finding of this Court that a reasonable person faced with the facts and circumstances that the defendant was faced with on March 21, 2007 "would have understood herself to be subjected to restraints comparable to those associated with a formal arrest" and that she was not free to leave the Border Patrol office when being questioned by S.A. Waugaman. *Tankleff v. Senkowski, supra.* As a result, the defendant was not properly warned and advised of her rights as required by *Miranda* and its progeny and, therefore, all of her statements and responses given to S.A. Waugaman must be suppressed.

The defendant has also moved to suppress the use of physical evidence seized from the premises at 1325 Millersport Highway, Amherst, New York on March 26, 2007 pursuant to a search warrant issued by Magistrate Judge Scott on March 20, 2007. (Docket #19).

As previously noted, none of the information obtained by S.A. Waugaman from the defendant during his interrogation of her on March 21, 2007 was used to support the application for the search warrant issued by Judge Scott on March 20, 2007 for the premises located at 1325 Millersport Highway, Amherst, New York.

In support of her motion to suppress, the defendant merely asserts "that the search warrant . . . was improvidently granted pursuant to Federal Rules of Criminal Procedure 12 and 41(h) and the evidence obtained as a result of that search should be suppressed." (Docket #19, p. 24). Basically, the defendant claims that probable cause for the issuance of the search warrant at issue was lacking.

In determining whether probable cause exists for the issuance of a search warrant, the United States Supreme Court has stated:

> The totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception." (citation omitted). "In dealing with probable cause, . . . as the very name

implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (citation omitted.)

In *Aguilar,* we required only that "the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that . . . narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant . . . was "credible" or his information "reliable." (citation omitted).

As our language indicates, we intended neither a rigid compartmentalization of the inquiries into an informant's "veracity," "reliability," and "basis of knowledge," nor that these inquiries be elaborate exegeses of an informant's tip. Rather, we required only that *some* facts bearing on two particular issues be provided to the magistrate.

\* \* \*

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis . . . for [conclud[ing] "that probable cause existed. (citation omitted). We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*.

Illinois v. Gates, 462 U.S. 213, 231, 238-239 (1983).

As the Court of Appeals for the Second Circuit stated:

A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. "Where [the]

-16-

> circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In particular, where the officer requesting the search warrant relies on an informant, the magistrate's role is to examine the totality of the circumstances and to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see United States v. Feliz-Cordero*, 859 F.2d 250, 252-53 (2d Cir. 1988).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

I find that the defendant has failed in her burden to invalidate the search warrant issued by Magistrate Judge Scott on March 20, 2007 and that her argument that probable cause was lacking for issuance of that warrant is without legal merit. Therefore, it is recommended that her motion to suppress the evidence seized pursuant to that warrant on this basis be DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

_S/ H. Kenneth Schroeder, Jr._
**H. KENNETH SCHROEDER, JR.
United States Magistrate Judge**

**DATED:** **March 30, 2009
Buffalo, New York**